**Charles L. WEBB, Petitioner**

v.

**STATE CIVIL SERVICE COMMISSION (DEPARTMENT OF TRANSPORTATION), Respondent**

**Department of Transportation, Petitioner**

v.

**State Civil Service Commission (Webb), Respondent.**

Commonwealth Court of Pennsylvania.

Argued Sept. 4, 2007.

Decided Oct. 15, 2007.

---

Joseph C. Korsak, York, for petitioner.

Audrey Feinman Miner, Harrisburg, for respondent.

BEFORE: McGINLEY, Judge, LEAVITT, Judge, FLAHERTY, Senior Judge.

OPINION BY Judge McGINLEY.

These are consolidated appeals from the decision of the State Civil Service Commission (Commission) which demoted Charles L. Webb (Webb) from his position of Pennsylvania Department of Transportation (PennDOT) Senior Highway Maintenance Manager York County to the position of Assistant Highway Maintenance Manager and reinstated him without back pay and without seniority credit from April 17, 2006.

Webb was employed by PennDOT since 1985, most recently as Senior Highway Maintenance Manager. Webb supervised approximately 156 employees and was the highest ranking PennDOT official in the York County Maintenance Office.

On July 31, 2001, Webb signed a Commonwealth Internet/E-mail User Agreement (User Agreement). Agreement at 1; Reproduced Record (R.R.) at 255a. By signing the User Agreement Webb agreed not to use the internet or e-mail system to, *inter alia,* (a) view, access, transmit, or create sexually suggestive, pornographic, obscene materials, or material that a reasonable individual may find personally offensive or inappropriate; (b) send messages to multiple recipients, such as chain letters or advertisements, that can hamper net work operations and present a negative public image; and (c) engage in any unethical behaviors or activities that would bring discredit to the Commonwealth or its agencies. The User Agreement also stated that "I understand that disciplinary action, up to and including termination, may be taken if I fail to abide by any of the requirements of this agreement." User Agreement, July 31, 2001, at 1–2; R.R. at 255a–256a.

On January 27, 2003, the Deputy Secretary of Administration issued a written policy for employee internet and e-mail use that informed all employees that the appointing authority may monitor e-mail activity with or without notice and that no employee has an expectation of privacy. The e-mail policy prohibited "viewing, accessing or transmitting any material that a reasonable individual may find personally offensive, or inappropriate, including but not limited to sexually suggestive ... materials." January 27, 2003, Standards for Employee Internet and Email use at 1; R.R. at 283a.

On January 5, 2006, PennDOT received a voice mail message on its employee "Tip Line" which alleged that York County assistant maintenance managers were sending "derogatory" e-mails of a sexual nature to each other. The message also alleged that Webb was often out of the office.

PennDOT's Human Resources Analyst, Tiffany Luby (Luby) was assigned to in-

vestigate Webb's internet history and e-mail usage. Luby requested Human Resources Analyst, David Rotigel (Rotigel), to capture Webb's e-mails. Rotigel forwarded the request to Office of Administration employee, Jodi Dorman (Dorman), who was responsible for managing and organizing all requests for e-mail histories. Dorman forwarded the request to the Commonwealth Technology Center (CTC) where the e-mail accounts are stored. Stephen Dunn (Dunn) and Mushiaf Jawed (Jawed) of CTC proceeded to capture and record Webb's e-mail history for five weeks, starting January 18, 2006. Electronic access links were sent to Dorman who opened the links and copied the contents of Webb's e-mail mailbox onto a CD. Dorman made a total of five CDs that contained Webb's e-mails. Dorman contacted PennDOT who sent somebody to pick up the CDs. Dorman did not open or view the contents of the recorded e-mails.

Luby transferred the contents of the CDs onto her computer and accessed them through the Outlook program. She reviewed the contents of Webb's "inbox", "sent" and "deleted" folders and printed every e-mail she thought was not work-related. Luby opened all of the documents, viewed all of the video clips and listened to all of the audio filed that were on Webb's H drive. If she thought it was not work-related, she copied it.

Of the numerous e-mails that were captured and reproduced, Luby found the following e-mails that Webb sent to subordinates and individuals outside PennDOT:

(1) an e-mail with an attached video clip of a Guinness Beer commercial that Webb sent to all of his male subordinates;

(2) an e-mail that he sent to his male subordinates containing a picture of a man standing at a urinal and above the urinal were pictures of women;

(3) an e-mail joke regarding big breasted women working at Hooters, and asking where women with one leg work, and the response is "I HOP";

(4) an e-mail joke regarding women trading sexual favors in exchange for a car ride and then pick-pocketing the driver during the act;

(5) photos sent to his male subordinates including one of a group of women all raising their middle finger and another shows the statement "some asshole is on his cell phone";

(6) another series of photographs sent by Webb to his male subordinates, one of a woman where you can see her underwear, the second being a picture of two men sitting with one man's hand covering the other man's genital area, the third is a woman walking and dragging toilet paper with her, the fourth is of a man and woman posing for Christmas photos and the woman's breast is exposed, the fifth one is of a woman who peed her pants, the final one is of a woman getting into the back of a car and her skirt is lifted so that you can see her entire rear end.

Luby also reviewed twenty-seven non work-related audio and video clips Webb stored on his H drive which Luby found in his "Resources" file:

(1) a video called "Blades 1" of a man on a pair of roller blades who has an accident;

(2) a video entitled "Blaupunkt" depicts two stuffed animals simulating a sexual act;

(3) a video entitled "Break Wh1" showed two men on a motorcycle doing wheelies and then collide with each other;

(4) an audio clip called "Captains" in which an airplane pilot describes scenery to his passengers and mentions that

he is also carrying a weapon, as are his co-pilot and head stewardess and that the bullets go through you and put a hole in you like the Grand Canyon;

(5) a video clip called "Cellular" shows a husband coming into his wife's bedroom while she is in bed, a cell phone starts to ring and a nude man comes out of the closet to answer the ringing cell phone;

(6) a video clip of a woman walking her dog, the dog pulls the leash and Grandma goes flying through the air;

(7) an excerpt from a Bridgestone Tire Commercial titled "Heartbroken" which depicts a male dog carrying a bone to his girlfriend dog. When he sees her with another dog in a sexual act, he drops the bone and runs into traffic. The car he runs in front of stops abruptly and displayed is the Bridgestone Tire logo;

(8) a video entitled "ICE" which shows a man who cleans snow and ice off of a car when he comes to the realization that it is not his car;

(9) a video entitled "Iraqi night" showing a military vehicle with two soldiers walking around; the two soldiers are then killed and the vehicle explodes;

(10) a video shows a gymnast colliding with a wall and having a series of accidents;

(11) a video called "Movie" showing people getting frightened by other people or objects;

(12) a video entitled "new mouse" showing two animated animals using a real mouse as a computer mouse;

(13) a video called "Oh crap" in which a crane with a construction beam knocks into an outhouse which then collapses to reveal a man covered in human waste;

(14) a video showing a state trooper pulled over to the side of a road when another trooper pulls up, gets out of his car and another car crashes into the police vehicle;

(15) an audio clip of a police answering machine which says things along the lines of "press 1 if you want to tell us all the police you are related to"; "press 2 if you want us to take care of your kids";

(16) a video entitled "Search Your Prisoner" which shows a man who shoots himself in the head and falls over while in police custody.

There were also a number of non work-related jokes on Webb's H drive including:

(1) a cartoon with a man creating the computer password P–E–N–I–S and the computer responding that the password was not long enough;

(2) a word document entitled "The Benefits of Sex";

(3) a November 1, 2002 e-mail from one of his subordinates with a joke about an Indian and two government officials;

(4) a January 5, 2004, e-mail from a second subordinate containing a military joke;

(5) a March 19, 2004, e-mail from a third subordinate containing a joke about firefighters;

(6) a September 8, 2004, e-mail from a fourth subordinate with a joke entitled "Irish and French War";

(7) a January 3, 2005, e-mail from a fifth direct subordinate with several trivia facts.

A pre-disciplinary conference (PDC) was held on March 6, 2006. Luby conducted the hearing. Webb acknowledged his awareness of the internet and e-mail policies and the fact that he signed a User Agreement. At the PDC, Webb conceded that most of the e-mails Luby questioned him about were not work-related and said that he sent them to his subordinates to either boost morale or relieve stress. Webb admitted at the PDC that most of

the e-mails he had forwarded were inappropriate. He also agreed that by sending them he was giving permission to his subordinates to view non work-related e-mails and photos.

PennDOT removed Webb from his position as the York County Maintenance Manager on April 17, 2006. The basis for removal included (1) violation of the Commonwealth and PennDOT policies on employee internet and e-mail use; (2) violation of Major Work Rule No. 20 (regarding unauthorized use of PennDOT tools and equipment, referring to Webb's computer); and (3) failure to carry out his duties as a manager in a proper and responsible manner.

Webb appealed the dismissal and a hearing was held before the Commission on June 19, 2006, July 31, 2006, and September 21, 2006, pursuant to Section 951(a) of the Civil Service Act.[1] The issue was whether PennDOT had just cause to remove Webb from his position.

PennDOT first presented the testimonies of Dorman, Dunn, Jawed and Luby who described the methodology in their roles in capturing and reproducing Webb's e-mails and contents of his H drive. Luby described each of the e-mails and Webb's response at the PDC. According to Luby, Webb acknowledged that most of the e-mails were non work-related and inappropriate.

The Commission issued its final Adjudication and Order on January 19, 2007. The Commission found that reliable evidence showed inappropriate e-mails were sent to and received by Webb and stored on his H drive. The Commission, howev-

er, did not believe the e-mails rose to the level of sexually suggestive, obscene or pornographic material and found the record was substantially less than what PennDOT originally charged. The Commission concluded there was no just cause to *remove* Webb. Nevertheless, it agreed with PennDOT that Webb's conduct reflected poorly on his role as Senior Highway Maintenance Manager. The Commission found credible the testimony of PennDOT's witnesses regarding the methodology by which the e-mails were captured, secured and provided to Luby. In addition, the Commission found credible Luby's testimony regarding the methodology by which she reproduced and reviewed Webb's e-mails and H drive files.

The Commission set aside PennDOT's removal and ordered that Webb be reinstated and immediately demoted to Assistant Highway Maintenance Manager position without back pay or seniority credit.

Both Webb and PennDOT appeal the Commission's January 19, 2007, order.[2] Webb raises the following four issues: (1) whether PennDOT proved a reliable "chain of custody" for the electronic evidence; (2) whether there was sufficient evidence to warrant his demotion; (3) whether the Commission's decision to deny back pay and seniority accrual was supported by substantial evidence; and (4) whether the Commission erred in finding a *prima facie* case for removal from his management position?

Penn DOT asserts that the Commission erred when it reinstated Webb because his

---

1. Act of August 5, 1941, P.L. 752, *as amended,* 71 P.S. §§ 741.951(a).

2. This Court's scope of review of a decision of the Commission is limited to determining whether constitutional rights have been violated, whether an error of law has been com-

mitted, or whether substantial evidence supports the necessary findings of fact made by the Commission. *Nosko v. Somerset State Hospital,* 139 Pa.Cmwlth. 367, 590 A.2d 844 (1991).

conducted constituted just cause for removal.

*Chain of Custody*

■ The "chain of custody" rule comes from the principle that "real evidence" must be authenticated prior to its admission into evidence. The purpose of this threshold requirement is to establish that the item to be introduced is what it purports to be. The ultimate question is whether the authentication testimony is sufficiently complete so as to persuade the court that it is improbable that the original item has been exchanged with another or altered in any material aspect. 5 Pa. Prac. § 5.34.

Rule 901(a) of the Rules of Evidence sets forth the requirements of authentication: "[t]he requirement of authentication and identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Testimony of a witness with personal knowledge that a matter is what it is claimed to be may be sufficient to authenticate the evidence. Pa. R.E. 901(b)(1).

Webb alleges that PennDOT failed to establish a chain of custody because there were seven "gaps" which rendered the evidence unreliable. Specifically, the first gap occurred between Dorman, the administrative assistant who submitted the request to the appropriate individual within the CTC, and the person to whom she sent the request. She never identified that person, nor did PennDOT put anyone on as a witness that stated they received the request from Dorman. Someone from the Technology Center then asked Jawed to capture the emails but PennDOT never identified the person who asked Jawed to make the e-mail files. Jawed testified that he sent the links to the e-mails to the HR person and team leaders. Therefore, the evidence established that the request did not come directly to Jawed, but from others and then to Jawed. The next "gap" occurred when an unknown individual picked up the compact discs from Dorman. Dorman testified that the individual signed the discs out, but the sign out sheet was not offered into evidence. Webb further asserts that the chain of custody for the documents stored on Webb's H drive was also broken by the Human Resources Department and Legal Departments because the individuals from those departments did not account for the whereabouts of this evidence while it was in their possession.

Webb acknowledges that gaps in the chain of custody go to the weight of the evidence not its admissibility. *Wise v. Commonwealth of Pennsylvania*, 100 Pa. Cmwlth. 205, 514 A.2d 308 (1986). He argues that the record reveals so many gaps in the chain of custody, the evidence was unreliable.

This Court must reject Webb's argument and his notion that PennDOT was required to prove a "chain of custody."

■ First, Webb did not identify any reason for the Commission to believe that the contents of the e-mails and H drive may have been altered or did not come from his computer. Although Webb claimed he did not know how the e-mails got to his computer, he never actually denied sending them or storing them on his computer. In addition, three PennDOT witnesses testified about what occurred at Webb's PDC hearing. Webb was shown paper copies of what was removed from his computer. Luby described each e-mail and video tape in detail. Webb never challenged Luby's descriptions of the electronic evidence, and he never claimed they were not copied from his computer. When Luby went through each of the e-mails and videos at the PDC, Webb acknowledged

them and admitted they were inappropriate and non-work related. He never claimed the contents of the e-mails or his H drive were altered or that the evidence was otherwise fabricated. Therefore, PennDOT was not required to establish a chain of custody.

■ In any event, every person who comes into contact with evidence need not testify personally. *Commonwealth v. Snyder*, 254 Pa.Super. 186, 385 A.2d 588 (1978).

Here, PennDOT's information and technology witnesses testified in detail the process by which they captured and reproduced the electronic evidence from Webb's computer. The Commission specifically found credible the testimony of Dorman, Dunn, Jawed regarding the methodology by which the e-mails were captured, secured and provided to Luby. The Commission further found credible the testimony of Luby regarding the methodology by which she reviewed and reproduced Webb's e-mails and H drive files. The Commission was satisfied that the various e-mails and H drive documents were Webb's and were reliable evidence of his e-mail and computer use during his work hours.

■ Moreover, the appropriate time to make a chain of custody argument is *before* the evidence is admitted. Once the evidence is admitted, a chain of custody argument may not then be raised for the first time to diminish the weight to be given to the evidence. The evidence is either admissible as authentic or it is not. Here, Webb did not assert a gap in the chain of custody before the documents were admitted. PennDOT's evidence was admitted, without objection, to identify the e-mails, video tapes and photographs that came from Webb's computer. Once the evidence was admitted, Webb was precluded from challenging the "gaps" under the

guise of assigning appropriate weight to admitted evidence. *UGI Utilities v. Unemployment Compensation Board of Review*, 851 A.2d 240 (Pa.Cmwlth.2004).

Because the Commission accepted PennDOT's evidence concerning the process by which it secured the electronic evidence and was satisfied as to its reliability and authenticity, this Court will not disturb that ruling.

### Sufficiency of Evidence to Warrant Demotion

■ Next, Webb argues he was not trained on the rules and he did not believe they were being enforced. He also claims that he was denied a fair and impartial PDC because PennDOT based its decision on Luby's account of what she believed was objectionable without an independent review of the videos and e-mails by other PennDOT officials. Finally, he claims PennDOT ignored his exemplary work record. This Court must reject each of these arguments.

■ First, the record establishes that the internet and e-mail policy guidelines were sent to all employees, including Internet/E-mail User Agreement, and the January 27, 2003, Policy Memo issued to all PennDOT employees on standards for employee internet and e-mail use. Webb signed the policies and acknowledged that he read them. The fact that Webb did not actually read them or believe they were enforced does not excuse his conduct. He remained bound by the provisions. *Keim v. Department of Health*, 117 Pa.Cmwlth. 452, 543 A.2d 1261 (1988) (holding knowledge of Management Directive 580.19 imputed); *Bowe v. Unemployment Compensation Board of Review*, 83 Pa.Cmwlth. 221, 477 A.2d 587 (1984) (holding claimant's lack of actual knowledge of Management Directive unpersuasive). *See also Metrick v. Civil Service Commission*, 687

A.2d 26 (Pa.Cmwlth.1996) (holding State employer was not required to show that employee's violations of its regulations or work rules were done intentionally in order to impose discipline).

■ This Court also disagrees that Webb was denied an impartial hearing because only Luby viewed the materials at issue. The fact that Luby was delegated the task of reviewing and evaluating the videos and jokes for objectionable content did not deprive Webb of a fair hearing. The record shows that Luby described the audio and video files and Webb did not dispute the accuracy of her descriptions. Webb agreed at the PDC that the content of the majority of the e-mails and jokes were "inappropriate" and "non work-related." In addition, the Commission received copies of the videos and e-mails at issue. It did not just rely on Luby's descriptions. To the contrary, the Commission conducted its own impartial review and actually concluded that the materials "did not rise to the level of sexually suggestive, obscene or pornographic material" and it found the record was "substantially less than what PennDOT originally charged." This Court agrees with PennDOT that Webb has no legally cognizable reason to complain on this ground.

■ As to Webb's record of commendable performance, this did not immunize Webb from disciplinary action for misconduct in using his computer to collect and distribute inappropriate material to his subordinates. First, the record reveals that Webb had the equivalent of a five day suspension on his record when it was discovered that he was violating his Internet User Agreement. The suspension was for "failure to carry our [his] duties as a manager in a proper and responsible manner." The Commission specifically recognized that although Webb's "underlying misconduct for the March 16, 2004, discipline was

factually different, the charges are similar in regard to how he performs his role in a supervisory position." Commission's Adjudication, January 19, 2007, at 27. Based on the nature of Webb's infraction, the discipline he received was supported by the Commissions credited findings.

*Reinstatement without backpay and loss of seniority accrual*

Next, Webb asserts that the Commission's decision to reinstate without back pay and seniority accrual was not supported by substantial evidence. According to Webb, the Commission was unaware of his salary. Therefore, it could not have adequately gauged the measure of the punishment it inflicted. Webb contends that the demotion and pay loss, with loss of seniority, amounted to a "triple punishment for the same offense." He claims he has, in essence, been fined $60,000.

The Commission's authority to modify a penalty of PennDOT is contained in Section 952(c) of the Act, 71 P.S. § 741.952(c), which provides:

> In the case of an employe removed, furloughed, suspended or demoted, the commission may modify or set aside the action of the appointing authority. Where appropriate, the commission may order reinstatement, with the payment of so much of the salary or wages lost, including employe benefits, as the commission may in its discretion award.

The Commission's order demoting Webb, without backpay and without seniority accrual was not an abuse of discretion in light of the evidence. His actions involved an abuse of the authority entrusted to him in his leadership position. The fact that he lost salary and seniority due was consistent with a demotion. There was no abuse of discretion.

*Prima Facie Case for Removal*

■ Lastly, Webb contends the Commission erred in denying his motion to dismiss for failure to establish a *prima facie* case for removal. His motion was made in writing on July 31, 2006, and was denied by the Commission on August 21, 2006.

Where an employee alleges lack of just cause for removal, Commission hearings are governed by Section 951(a) of the Act and the attendant Rules of the Civil Service Commission at 4 Pa.Code § 105.15. The burden of proving a *prima facie* case of just cause is upon the appointing authority. Section 105.15(a) of the Rules of the Civil Service Commission, 4 Pa.Code § 105.15(a). At the conclusion of the appointing authority's case, the employee may move to dismiss on the ground that no *prima facie* case has been established. If a *prima facie* case is made out, the employee is afforded the opportunity to present his case. *Id.*

■ A civil service employee may be removed from employment only for just cause. Section 807 of the Act, 71 P.S. § 741.807. The appointing authority bears the burden of proving just cause for removal. *Western Center, Department of Public Welfare v. Hoon,* 143 Pa.Cmwlth. 212, 598 A.2d 1042 (1991). Just cause for removal must be merit related. *Woods v. State Civil Service Commission,* 590 Pa. 337, 912 A.2d 803 (2006). Merit-related criteria include whether the employee failed to properly execute his duties or has acted in such a way that hampers or frustrates the execution of his duties. *Id.* The criteria must in a rational and logical way touch upon the employee's competency and ability. *Id.*

Applying the *prima facie* standard, PennDOT proved Webb violated the internet and e-mail policies. Webb stored on his H drive jokes and e-mails which the

Commission found were inappropriate and non work-related. The Commission credited the testimony of several of Webb's superiors who felt that Webb did not set a positive role model or lead by example when he violated the computer policies. They testified that they could not rely on and trust Webb to adhere to and uphold and enforce the agency's policies. They believed termination was warranted because Webb condoned his own staff's violations of the very policies he was charged with enforcing.

The Commission did not err when it found that PennDOT presented a *prima facie* case regarding Webb's misuse of his computer and the e-mail system. Thus, it acted properly when it denied Webb's motion to dismiss and continued the matter for hearing to consider all of the evidence of record.

*PennDOT's appeal*

PennDOT asserts that the Commission erred as a matter of law when it reinstated Webb because his conduct constituted just cause for removal. It acknowledges that the Commission has discretion to modify the action of an appointing authority. PennDOT maintains that the modification here was inappropriate because the Commission "significantly understated" the character of the e-mails and videos. This Court must disagree.

■ PennDOT couches the issue in terms of a capricious disregard of evidence, however, PennDOT essentially requests this Court to substitute its judgment for that of the Commission and find that the videos and e-mails at issue rise to a level that is either sexually suggestive, obscene or pornographic. As Webb points out, Pennsylvania's appellate courts are not free to invoke a generalized concept of reasonableness to justify substituting their judgment for that of an agency. *Winter-*

*myer, Inc. and American General Group v. Workers' Compensation Appeal Board,* 571 Pa. 189, 812 A.2d 478 (2002). As long as the Commission exercised reasonable discretion in arriving at its findings, this Court must affirm. Here, whether the e-mails were sexually suggestive, obscene or pornographic, and if so, to what degree, were questions for the Commission. This Court agrees with the Commission that a reasonable mind might make the same decision on the evidence presented by Penn-DOT, and this Court declines PennDOT's request to substitute its judgment for that of the Commission. *Commonwealth Department of Revenue v. State Civil Service Commission,* 12 Pa.Cmwlth. 400, 316 A.2d 676 (1974).

The order of the Commission is affirmed.

## ORDER

AND NOW, this 15th day of October, 2007, the order of the State Civil Service Commission in the above-captioned matter is hereby affirmed.